UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ANGELA DRAKE,
on behalf of S.F., a minor,

        Plaintiff,

        v.                                              Case No. 10-C-0420

MICHAEL J. ASTRUE,

        Defendant.

## DECISION AND ORDER REVERSING AND REMANDING
## THE DECISION OF THE COMMISSIONER

Plaintiff, Angela Drake, on behalf of minor child SF, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her application for supplemental security income payments. In her application, SF claimed that mental and behavioral disorders have limited her ability to perform substantial gainful activity since March 17, 2006. After the Commissioner denied the application initially and on reconsideration, SF requested a hearing. Administrative Law Judge Jacob D. Jacobson conducted the hearing on November 12, 2008, during which SF, Drake, and a medical expert, Dr. Feinsilver, testified. The ALJ issued a decision finding SF not disabled. SF's request for a rehearing was denied by the Appeals Council causing the decision to become the Commissioner's final decision as of April 3, 2010.

In the pending appeal, SF seeks a Sentence Four remand alleging that the ALJ failed to consider and weigh the experts' reports in the assessment of the case as required by 96-6p, discuss significant material evidence contrary to his opinions, reject SF's credibility properly contrary to SSR 96-7p, and otherwise relied upon insufficient

evidence. For the reasons set forth below, ALJ Jacobson's decision is vacated and this matter will be remanded for further proceedings consistent with this opinion.

STATEMENT OF FACTS

SF, who was 13 at the time of the hearing, has lived with her custodial aunt, Angela Drake, since her mother's death in 2002. (R. at 26, 31, 49, 68.) In 1997, SF witnessed her father shooting her mother in the head, and many of her mental impairments are associated with this incident. (R. at 54, 68.)

SF has struggled in school behaviorally and academically. Despite placement on school bound buses, SF is not in school at least twice a week. (R. at 44.) Drake receives calls twice a week for SF's disruptive behavior, such as failure to stay in her seat, wanting to leave class, seeking to leave the school building, and agitation. (*Id*.) In 2006, it appears that SF was suspended at least three times. (R. at 178-9.) At various times, SF left school "because some days just don't be my days" and "some days I don't be feeling right... I feel like, like unhappy sometimes and just don't feel like doing nothing, just feel like sitting down all day, going to sleep." (R. at 32-3.) It was estimated that SF had missed 35 days during the semester when the hearing was conducted. (R. at 34.) She cursed teachers (R. at 179), left the school to go to Jewel (R. at 182), was very loud (R. at 179), was defiant (R. at 178), and was a "constant classroom disruption." (R. at 179.) After she completed the 6th grade, she was expelled from Westwood. (R. at 47.) At Wedgewood, SF had tantrums and threw items "around the office." (R. at 48.) She also had to repeat the first grade. (R. at 50.) That being said, SF tried out for the cheerleading squad, and was in the school play. (R. at 35.)

SF struggles academically and has an Individualized Education Plan ("IEP") created pursuant to the Individuals with Disabilities Education Act. (*See, e.g.,* R. at 227, 266.) Apparently, through her various updated plans, SF has attended mainstream and special education classes. (R. at 38.) The May 2006 IEP indicates that SF worked well independently, but did not return homework, needed maximum support to complete her class work, and did not complete tasks she found difficult. (R. at 231.) She was delayed significantly in receptive and expressive language skills, impairing her ability to perform grade level work. (*Id.*) SF read at a third grade level, and was at a second grade level in math, spelling, and writing. (*Id.*) Her effort and motivation depended on her interest and mood. (*Id.*) Finally, the May 2006 IEP noted that SF was disruptive in class, at times, and disrespectful to peers and adults. (*Id.*)

SF's February 2007 IEP was created when she was in the 5th grade. (R. at 275.) Teachers were concerned about SF's ability to understand and complete assignments. (R. 277.) On the other hand, teachers were no longer concerned with SF's ability to communicate and SF no longer displayed behaviors that were severe, chronic, or frequent. (R. at 281, 291.) SF's reading was at a second grade level, her language arts were at a second to third grade level, and her math was at a fourth grade level. (R. at 277.) She was delayed significantly in listening comprehension, reading comprehension, and oral expression, though this was evaluated to be the result of deficits related to remembering and accessing information. (R. at 279.) Further testing was required to determine proficiency in reading, math, and writing. (R. at 288.) Also, she required repeated instructions and clarification. (*Id.*) Additionally, she needed a small group setting to

3

facilitate assessment of her ability to read, write, and do math. (*Id*.) SF placed in the 2nd percentile in reading, and 5th percentile in math. (R. at 357.)

In the first quarter of 2007/08 academic year, one of SF's teachers noted that "[o]verall, [Plaintiff] has the potential to be an excellent student. There are some areas that she needs to improve in: she needs to listen and follow directions in class, work on her reading, show respect for others, and take responsibility for her learning and her actions." (R. at 356.) However, in January 2008, SF was expelled from Academy of Learning and Leadership after she refused to remain in class, or to be respectful to any adult. (R. at 359.)

Additionally, SF has experienced legal trouble. She has been issued tickets for curfew violations, retail theft, disorderly conduct, burglary, and attempted burglary. (R. at 42-3.) By age 10, she stole from a grocery store "on a regular basis." (R. at 226.) The IEP also indicated that SF had stolen from the grocery store 10-12 times in one year. (R. at 276.) Apparently, as a result of these crimes, SF is on a 24-hour curfew with which she complies. (R. at 50-1.)

SF has claimed that she has trouble sleeping. She testified that she awakes every night and was unable to get back to sleep. (R. at 39.) About three times each week, SF has nightmares, dreams that she talks to her deceased mother, and is afraid. (*Id.*)

SF lives with her aunt, cousins, and siblings. (R. at 36.) She gets along with them, as well as adults outside the home. (R. at 36, 48.) SF testified that she prepares for school without assistance. (R. at 37.) She also performs household chores including washing dishes, cleaning the bathroom, and taking out the garbage. (R. at 37). However, she does have tantrums during which she throws items. (R. at 48.)

4

SF has had an extensive history of therapy, including psychological and speech. In 2006, at age 10, SF began therapy at Renew Counseling Services. (R. at 219.) The therapist noted that SF appeared traumatized by witnessing her mother's shooting and subsequent death. (R. at 226.) It was observed that SF's speech pattern was blurred. (R. at 224.) Moreover, she was depressed, and had difficulty sleeping, severe emotional liability, severe anxiety, severe lack of energy, mild loss of interest in pleasurable activities, and moderate crying spells. (R. at 224-5.) Further, SF exhibited severe difficulty in concentration, memory and attention. (*Id.*) The therapist noted that SF had had nightmares since her mother's death and diagnosed a nightmare disorder, indicating that SF needed support in dealing with her lack of respect for authority figures, abandonment issues, and the trauma of her mother's shooting and death. (R. at 226.) Finally, the therapist reviewed SF's theft from grocery stores. (R. at 226.)

A function report completed April 26, 2006 indicated that SF's speech was severely impaired due to a stutter. (R. at 127.) Though she could be understood by people who knew her well, she could hardly ever be understood by people who did not know her well. (*Id.*) SF was unable to deliver phone messages, make new friends, or get along well with teachers. (R. at 128, 131.) She could not tie her shoes, use zippers alone, wash her own hair, choose her own clothes, comb her hair, help around the house, do what she was told most of the time, obey safety rules, arrive at school on time, or accept criticism or correction. (R. at 132.) Her ability to pay attention or focus was limited. (R. at 133.) Alone, SF could not stay busy, complete homework, or complete chores. (*Id.*)

5

A letter from the Program Director of the Boys and Girls Club confirms the Function Report. (R. at 183.) The Director wrote of SF's anger management issues, and dislike of corrections or instructions. According to the Director, when people tried to reprimand SF, she became more upset and disengaged. (*Id.*) On the basis of these observations, the Director recommended counseling. (*Id.*)

In July 2006, psychologist Dr. Timothy Wiedel diagnosed SF with an adjustment disorder mixed with disturbance of emotion and conduct, an expressive language disorder with mild symptoms, extended bereavement, and continued adjustment difficulties secondary to her mother's death. (R. at 196.) Dr. Wiedel assessed SF's Global Assessment of Functioning to be a score of 60, indicating that she had mild to moderate impairment in social and educational functioning. (*Id.*)

In August 2006, state agency consulting psychologist Cathy Propper reviewed the evidence and opined that SF's impairment or combination of impairments were severe, but did not meet or equal the disability listings. (R. at 200.) Dr. Propper found that SF had less than marked limitations in the SSR diagnostic domains of acquiring and using information, and interacting and relating with others; marked limitation in caring for herself; and no limitations in attending and completing tasks, moving about and manipulating objects, and health and physical well-being. (R. at 202-3.) In October 2006, Dr. Propper's opinions were affirmed by state agency consulting psychologist Dr. Michael Mandli. (R. at 214.)

At various times, SF has enrolled in "day hospitalization" programs. First, SF was admitted to Rogers Memorial in October 2007 where SF initially responded well to treatment. (R. at 301.) Treated by psychiatrist Dr. Kim, SF detailed her problems at

6

school. Dr. Kim noted that SF had been disrespectful at school, walked out of classrooms, used foul language, threw items, made verbal threats, physically fought, had mood swings, awoke with nightmares, and reported "seeing" her deceased mother. (R. at 325.) She made comments about wanting to die. (R. at 316.) SF's symptoms included fighting with peers, uncontrollable crying, dress/hygiene issues, poor attention span, and feelings of being alone or isolated. (R. at 327) She exhibited sleep disturbance, racing thoughts, and fears. (*Id*.) Dr. Kim was concerned that SF posed a moderate safety risk, and admitted her for treatment five days per week. (R. at 329.) However, after missing 7 of 45 days, she was dismissed. (R. at 49-50.) Diagnosis there included post traumatic stress disorder ("PTSD") and depression NOS.[1] However, Rogers Memorial also diagnosed mood disorder NOS. (R. at 318-9.) Rogers Memorial assigned SF a GAF score of 44, but noted that she had received a 66 GAF score in the past year. (R. at 319.) SF's discharge indicated no diagnostic changes other than her GAF score of 41. (R. at 306.) Auditory hallucinations and increasing suicidal thoughts. (R. at 315-6.) She had increasing aggressive behavior at home and school. (R. at 306.) Moreover, SF was noted as threatening to cut the necks of her teachers and peers, lying to her guardian, and generally engaged in high risk behavior. (*Id.*)

Next, SF was admitted to the Aurora "day hospitalization program," (R. at 368-99) which she attended for three to four before being "chased away by security staff" after transportation brought her for treatment. (R. at 50.) Aurora also dismissed SF for missing too many treatment sessions. (*Id.*) Before being dismissed, she was diagnosed

---

[1]Not otherwise specified.

7

with mood disorder NOS, disruptive behavior disorder NOS and a GAF score of 52 at admission. (R. at 399.) On May 13, 2008, SF was discharged to return to school full-time with a GAF of 50. (R. at 370, 395.)

Independent medical expert Dr. Thomas Feinsilver testified at her hearing. (R. at 51-68.) Dr. Feinsilver, who did not examine or treat SF, opined that SF's impairments fit into three categories, (1) PTSD, (2) attention deficit disorder ("ADD"), and (3) disturbance of conduct or personality disorder, which was the primary cause of SF's disability. (R. at 52, 54.) Dr. Feinsilver acknowledged SF's truancy and questioned the ADD diagnosis. (R. at 54, 56.) With respect to the six functional domains of the SSR diagnostic rubric, Dr. Feinsilver opined that SF had a marked limitation in domain two, attending and completing tasks. (R. at 57-8.) He further opined that SF was between less-than-marked and marked limitations in domain one, acquiring and using information. (R. at 57.) Reviewing the domains in numerical order and after reviewing domain two, he then stated confusingly that, "I would rate her under this domain, too, as markedly impaired." (R. at 57.) Finally, he opined that SF was between less than marked and marked limitations in domain three, interacting and relating with others. (R. at 57-8.) In Dr. Feinsilver's opinion, SF had a less-than-marked or no limitation in the remaining domains. (R. at 57-8.)

Next, Dr. Feinsilver opined that SF is "close" to functionally equaling Listing 112.08 because of her anti-social personality disorder, and her disregard for societal norms, and conforming to lawful and appropriate behavior. (R. at 59.) He advised that SF's medical records indicate a gradual worsening of SF's anti-social traits. (R. at 60.) Indeed,

8

he testified that SF's "horrific life experiences," unhappiness, anxiety and PTSD were the driving forces of her behavior. (R. at 61.)

The ALJ wrote an eleven page opinion, roughly two pages of which discussed facts. (R. at 13-23.) He split this review of the facts into two conclusions of law. The third conclusion of law ("Finding 3") evaluated whether SF's impairments meet or medically equal the listings of 12.06, 12.08, or 20 C.F.R. Part 404, Subpart P. In support of his rejection of finding SF disabled under these listings, the ALJ referred to "some speech and language assistance at school to deal with mild speech difficulties," the shooting death of SF's mother, "some counseling in September and October 2006," PTSD and depression NOS, some counseling in which she was discharged due to non-attendance, "prescribed medication." (R. at 16.) The ALJ concurred with "the medical expert" who made "some references" to ADD and opined that SF was "only having occasional nightmares," and indicated that SF was having personality disorder problems including truancy, robberies, and burglary. (*Id.*) Lastly, the ALJ found, that SF "does have friends at school and gets along with her cousins." (*Id.*)

The ALJ's fourth conclusion of law ("Finding 4") evaluated whether SF's impairments or combinations of impairments *functionally equaled* the listings. (*Id.*) This assessment, presented as a rejection of SF's credibility, is summarized in one paragraph, pieces of which are repeated throughout the opinion. (R. at 17, *cf.,* R. at 20, 21, 22.) He characterized the record broadly, indicating that SF "has not had a great deal of care on a consistent or regular basis. She has been seen from time to time and prescribed medication." (R. at 17.) Specifically, he indicated that SF "has friends, gets along well with teachers, and participates in school activities. She has tried out for the school play and

9

cheerleading squad." (*Id.*) SF gets along well with her cousins, and cares for herself. (*Id.*) SF has problems "in terms of only going to school when she feels like it and getting into various mischief when she is not in school." (*Id.*) She is compliant with a 24-hour curfew. (*Id.*) Therapy and medication were helpful. (*Id.*) She attends some "regular" [*sic*] classes but also receives special education assistance. (*Id.*) Finally, the ALJ rejected the credibility of a document indicating that SF could "do almost nothing" around the house as inconsistent with the record. (*Id.*)

## CONCLUSIONS OF LAW

The district court's review is limited to determining whether the Commissioner's decision is supported by "substantial evidence." 42 U.S.C. § 405(g). The Commissioner's findings are conclusive if supported by substantial evidence. *Id*. The court reviews the entire record to determine if it supports the Commissioner's decision. *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992). Substantial evidence is such evidence contained within the entire record as a reasonable mind might accept as adequate. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Outlaw v. Astrue,* 412 Fed. Appx. 894, 897 (7th Cir. 2011). The court may not substitute its judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Though the ALJ need not discuss all of the evidence, the ALJ must consider all relevant evidence, and may not discuss only that evidence that supports its own recommendations. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001). On appeal, the Commissioner's attorneys cannot

defend the Commissioner's decision on grounds that the Commissioner has not embraced. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

An award of benefits is appropriate only if all factual issues are resolved, and if the resulting record supports only the conclusion that an applicant qualifies for disability benefits. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Minors may receive disability benefits under the Social Security Act, and are provided unique requirements in determining their disability status. 42 U.S.C. § 1382c(a)(C)(I); 20 C.F.R. § 416.906.

To determine whether a minor's impairments render the minor disabled, the Commissioner must evaluate six domains. If a minor has an extreme limitation in any one of the domains, the minor is disabled. 20 C.F.R. § 416.926(a)(d). If a minor has a marked limitation in any two of the domains, the minor is disabled. *Id.* The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

The ALJ's findings that SF did not have an impairment that equaled or functionally equaled any listed impairment and that SF had less than marked limitations are not wholly supported by the record. The ALJ found that SF had the following severe impairments: post traumatic stress disorder and personality disorder and concurred "with the assessments of the medical expert, as they are supported by the medical evidence in the record." The medical opinions in the record also included references to an expressive language disorder, extended bereavement and adjustment difficulties, and depression. For example, Dr. Feinsilver found posttraumatic stress disorder based on the earlier "fairly horrific life experiences," a question as to whether there is attention deficit disorder,

11

behavioral disturbance, and conduct disorder. Dr. Weidel found an adjustment disorder with mixed disturbance of emotion and conduct, expressive language disorder, and extended bereavement with continuing adjustment difficulties, Dr. Propper found an adjustment disorder with disturbance of emotions and conduct and speech and language delays, and Dr. Kristine Kim at Rogers Memorial Hospital diagnosed posttraumatic stress disorder and depression with a GAF of 41 to 44.

In making his findings, the ALJ did not address various experts' opinions and evidence in the record. Initially, Dr. Feinsilver found domain one "less than marked," but then reviewed domain two and stated, "I would rate her under this domain, too, as markedly impaired." This could easily have been a typo; indeed, the sentence would be clear if Dr. Feinsilver had said "I would rate her under this domain two as markedly impaired." In any case, this was a cursory statement that did not involve any discussion and awarding benefits is only appropriate where all factual issues are resolved. Meanwhile, Dr. Propper and Dr. Mandli found marked limitations in "caring for yourself." While a combination of these opinions potentially support two marked impairments, and therefore a finding of disability, the ALJ's analysis with respect to acquiring and using information, interacting and relating to others, and caring for yourself was summarized as follows:

> <u>The claimant has less than marked limitation in these three domains of functioning</u>. The evidence shows the claimant has friends and generally gets along well with teachers. She participates in school activities and has tried out for the school play and cheerleading squad. She also gets along well with siblings and cousins. The claimant is generally able to manage her own personal hygiene, feed herself and get dressed with only occasional reminding. The claimant is in regular education classes, but receives some special

12

>education assistance once each day. Her report card from the
>sixth grade shows her grades are As through Cs.

(Doc. # 15-3, p. 20.)

Mindful that the ALJ was not required to discuss every piece of evidence, there is a need to discuss all relevant evidence creating a logical bridge to the result domain. In addition to ignoring the opinions of the state agency physicians, he never mentions an IEP, that SF had been expelled from two different schools, the diagnoses at Renew Counseling or Aurora, or any counseling at all. Moreover, the ALJ did not mention the function report, the letter from the Director of the Boys and Girls Club, or the assessment of Dr. Weidel.

Additionally, the over broad characterizations sheds little insight into the complexities of the evidence. For example, the ALJ's reference to SF's "lack of interest in going to school" does not address that SF missed 35 days of school in the semester in which the hearing occurred. School administrators called Drake repeatedly because of SF's inability to comply with school rules, cursing and threatening teachers, "chronic classroom disruption," and at least four separate suspensions in 2006. And aside from the comment that the "medical records document the claimant's treatment/counseling, as discussed above," the ALJ did not discuss SF's psychological impairments. The ALJ notes that SF received "some counseling" in September and October 2006, but this does not reflect the diagnoses for SF provided by Renew Counseling Services or the diagnoses of the day hospitalization programs at Aurora and Rogers Memorial, including that SF was considered to be at risk for suicide.

As a final matter, an ALJ must provide specific reasons for a finding on credibility, and be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight that was given to the individual's statements and reasons for that weight. SSR 96-7p. The rejection of SF's statements pertaining to the intensity, persistence, and limiting effect of her symptoms is not sufficiently specific to make clear the weight given to the statements or even which statements were rejected.
SF alleged behavioral, psychological, and speech impairments, which were not addressed in the relevant findings. While an ALJ can weigh and reject evidence, he must be clear that he considered the important evidence.

Overall, the cursory factual review ignores evidence contrary to the findings and fails to properly confront and reject the credibility of SF. Thus, he has failed in his burden to provide substantial evidence and the identified factual issues must be resolved. Now, therefore,

IT IS ORDERED that the decision of the Commissioner is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration.

Dated at Milwaukee, Wisconsin, this 15th day of September, 2011.

                                                                    BY THE COURT

                                                                    /s/ C. N. Clevert, Jr.
                                                                    C. N. CLEVERT, JR.
                                                                    CHIEF U. S. DISTRICT JUDGE